Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/08/2019 09:05 AM CST

Randy S., appellee, v. Nicolette G., appellant.
___ N.W.2d ___

Filed March 8, 2019.    No. S-18-407.

1. **Child Custody: Appeal and Error.** An appellate court reviews child
   custody determinations de novo on the record, but the trial court's deci-
   sion will normally be upheld absent an abuse of discretion.
2. **Judgments: Words and Phrases.** An abuse of discretion occurs when
   a trial court bases its decision upon reasons that are untenable or unrea-
   sonable or if its action is clearly against justice or conscience, reason,
   and evidence.
3. **Statutes: Appeal and Error.** Statutory interpretation presents a ques-
   tion of law, which an appellate court reviews independently of the lower
   court's determination.
4. **Trial: Judges: Presumptions: Appeal and Error.** An appellate court
   presumes in a bench trial that the judge was familiar with and applied
   the proper rules of law unless it clearly appears otherwise.

Appeal from the District Court for Washington County: John
E. Samson, Judge. Affirmed.

Mark J. Milone and Michael W. Milone, of Koukol &
Johnson, L.L.C., for appellant.

Edmond E. Talbot III, of Talbot Law Office, P.C., L.L.O.,
for appellee.

Miller-Lerman, Cassel, Stacy, Funke, Papik, and
Freudenberg, JJ.

Papik, J.
This appeal arises out of paternity proceedings involving
Nicolette G., Randy S., and their daughter Eleanor G. Nicolette

appeals the order of the district court that awarded sole legal and physical custody of Eleanor to Randy.

Nicolette's primary argument on appeal rests on her contention that she proved at trial that Randy had committed child abuse under Nebraska law. She argues that under such circumstances, the district court was required by statute both to impose sufficient limitations on Randy's custody and parenting time to protect Eleanor and to make special written findings that Eleanor would be protected by such limitations. She contends the district court did neither. Nicolette also contends that the district court generally abused its discretion in its award of custody, parenting time, and child support. Upon our de novo review of the record, we find no reversible error, and therefore, we affirm.

## BACKGROUND

*Paternity Proceeding.*

Nicolette and Randy agree that they are the parents of Eleanor. Eleanor was born in 2014. Nicolette and Randy have never married one another, but they did live together with Eleanor until October 2016, when Randy initiated paternity proceedings.

Randy's operative complaint sought a paternity determination, sole legal and physical custody, and child support. In her operative answer and counterclaim, Nicolette sought a paternity determination, sole physical custody, joint legal custody, and child support. In accordance with the parties' stipulation, in November 2016, the district court entered a temporary order providing for a parenting time cycle of two weekdays with Randy, three weekdays with Nicolette, and alternating weekends and major holidays. The matter proceeded to trial in January 2018.

*General Evidence Regarding Parties and Their Relationship With Eleanor.*

The evidence at trial showed that both Nicolette and Randy have been active caregivers for Eleanor, both contributing their

time, efforts, and money. Nicolette and Randy both described strong, positive relationships with Eleanor. Both parties also have supportive families.

Nicolette testified that she has degrees in culinary arts and general studies, focusing on nutrition, healthcare, and restaurant management. As of the date of trial, Nicolette had spent 3 months working full time for a nonprofit organization focusing on literacy. Previously, she had held various jobs in the retail and service industries. At the time of trial, Nicolette resided with her parents in Omaha, Nebraska, where Eleanor has her own bedroom. Nicolette testified that within weeks, she would move to her own two-bedroom apartment in Omaha, where Eleanor would have her own bedroom.

Randy had completed high school and one semester of community college. At the time of trial, Randy owned and operated a business installing electronic accessories in cars, something he had done for 12 years. He had also previously done intermittent construction work and sold roofing materials, gutters, and siding. Randy testified that at the time of trial, he resided in Blair, Nebraska, where he owns a home in which Eleanor has her own bedroom. Nicolette presented evidence of unsafe conditions that existed in Randy's home at the time they separated in October 2016, including unfinished and exposed electrical outlets and an open staircase without a railing, leading from the first to the second floor. Randy presented evidence that he had fixed the unsafe conditions after he filed suit.

*Randy's Alcohol Use.*

The district court heard evidence about Randy's alcohol use. In general, the evidence showed that Randy, who has a family history of alcoholism, drank heavily while Nicolette lived with him, but since she had moved out in October 2016, his drinking had diminished.

Nicolette testified that when she lived with Randy after Eleanor's birth, he drank alcohol daily. He would come home from work with the odor of alcohol on his breath and continue

to drink throughout the evening. Nicolette stated that he would start with beer and progress to cocktails. According to Nicolette, when Randy used alcohol, he had red eyes, poor balance, and slurred speech; was confused; repeated himself "a lot"; and "didn't seem to have a care in the world." Nicolette stated that the more Randy drank, the more irritable he would become. If she tried to advise him to slow down or stop drinking, he would "get mean" and critical. Nicolette testified that Randy's drinking affected his ability to care for Eleanor. She said he became "very inattentive, he was on his cell phone a lot."

Nicolette testified that after Eleanor was born, she had observed Randy "drink to excess" and then drive at least once or twice a week, and "[m]ore frequently" than "once or twice" when Eleanor was in the car. According to Nicolette, Randy turned down Nicolette's offers to drive and did not stop driving with Eleanor in the car when he was "in that condition." Randy's mother testified that she had observed Randy parent Eleanor while he was intoxicated. She denied knowing whether Randy had driven while intoxicated with Eleanor in the car. She stated, "[H]aving a beer and being intoxicated, you know, if I'm not counting I don't know."

Nicolette testified that both she and Randy had consumed alcohol while on a boat with Eleanor and that Randy had operated the boat while drinking, with Eleanor on board. Nicolette offered photographs purporting to show Randy operating a boat while drinking, with Eleanor as a passenger. However, either Randy is not operating the boat in the photographs or it is indiscernible whether the beverages he is holding are alcoholic. Randy's mother admitted that she had observed Randy consuming alcoholic beverages "while boating" and had warned him about it more than once, but that she did not recall whether Eleanor was present on the boat while Randy was drinking.

Randy admitted to being a heavy drinker when he and Nicolette were together. He claimed he used alcohol to cope

with Nicolette, with whom he found it difficult to get along. He defined heavy drinking as consuming more than six beers a day, 6 out of 7 days per week. Randy admitted that before Nicolette left, he had cared for Eleanor while intoxicated. He denied being intoxicated or "under the influence of alcohol" when driving with Eleanor in the car, but he admitted to driving with her after he had consumed "[a] drink, maybe two, over the course of three, four hours."

Randy and his family testified that Randy had changed his drinking habits and attitude since filing the paternity suit. Randy's stepmother testified that if she saw Randy drink at all, he would have only one beer and tell others he was not drinking because he had Eleanor. Randy's brother testified that he saw Randy once or twice a week. According to Randy's brother, before Eleanor was born, Randy was a regular drinker who "drank quite a bit." However, after breaking up with Nicolette, Randy's drinking had "changed a lot" and he no longer seemed depressed. Randy's brother stated that Randy does not drink more than one or two beers in Eleanor's presence.

Randy testified that since he and Nicolette separated, he had not been intoxicated while caring for Eleanor. According to Randy, since the separation, he usually consumed only one or two drinks at a time, except for the occasional social event. Randy maintained that 2 or 3 days per week, he does not consume alcohol at all. On the other days, he may have "a couple of drinks" after work. He stated that while Eleanor is in his care, he sometimes has a beer with dinner and then another drink after she is in bed.

*Confrontational Behavior.*

There was evidence that both parties had lashed out when they were angry. Nicolette admitted that on one occasion, when Eleanor was not present, she pushed Randy when he tried to take her keys to prevent her from driving while she was upset. Randy testified that before the parties separated, Nicolette threatened to hurt herself, call the police, blame it on Randy, and not allow him to see Eleanor again. Nicolette

admitted that Randy had never hit her, but she testified that when she resided with Randy, he would become angry, slam doors, and throw and kick things around in front of Eleanor. Nicolette stated that Randy had yelled at her and called her a "bitch" on multiple occasions in front of Eleanor.

*Nicolette's Mental Health.*

The parties presented evidence regarding Nicolette's mental health. Nicolette testified that she had been diagnosed with depression and anxiety. Depression makes her tired, makes her believe "there's nothing right in the world," and makes her worry all the time. She admitted that there are some days "where I shut down." She testified that occasionally, her anxiety will cause her to get nervous, shaky, dizzy, unfocused, and disoriented. Nicolette testified that she takes daily medication to manage her depression symptoms and medication for anxiety as needed.

Nicolette acknowledged that in May 2015, she had been hospitalized for 4 days because she experienced suicidal ideation after stopping her prescribed medication. Nicolette stated that she stopped taking her medication for 1 month, because it made her feel tired all the time and unfocused. She also testified that Randy criticized her for needing medication.

After being hospitalized, Nicolette consulted with mental health professionals to adjust her medication. Nicolette testified that since changing her medication, her mental health had improved, particularly her energy and mood. At the time of trial, she was attending therapy regularly. Nicolette developed a safety plan to provide for Eleanor's care in the event that she was hospitalized again, and the plan involved Randy, her parents, and her sister.

Nicolette's therapist confirmed Nicolette's mental health diagnoses, symptoms, and current treatment. The therapist opined that Nicolette had been working hard and responding positively to her current treatment while staying active in Eleanor's life. She rated Nicolette's progress as a "nine" on a "scale of one to ten" and stated Nicolette can be and is being a

good parent to Eleanor. The therapist had no concerns with an award of sole custody of Eleanor to Nicolette.

Randy presented evidence raising concerns related to Nicolette's mental health. Randy and his family and friends expressed generalized concerns about Nicolette frequently sleeping. Randy's mother, who saw Nicolette twice a week before the separation, testified that she had observed Nicolette to have negative attitudes and mood swings.

In addition, there was evidence that Nicolette had allowed Eleanor to play with her empty prescription pill bottles, but Nicolette testified that she stopped allowing it after Randy had confronted her. The parties testified that while they were living together, they called a poison control center due to concerns that Eleanor may have had contact with Nicolette's psychotropic medication. However, Eleanor apparently suffered no ill effects from any exposure, and Nicolette testified that she had learned from the experience.

There was testimony that once or twice a week, Nicolette consumes a beer or a glass of wine while caring for Eleanor. Nicolette conceded that alcohol consumption is likely contraindicated for her medication, although she had not specifically checked.

Randy expressed concerns about Nicolette's moving out on her own with Eleanor, because she had never been on her own with Eleanor and because of Nicolette's mental health. He testified that Nicolette had remarked in the past that she did not feel like she could handle Eleanor on her own. He also stated that previously when Nicolette lived on her own, her apartment was "very dirty," with unwashed dishes and cat litter, cat feces, and cat vomit on the floor.

*Eleanor's Education.*

Both Nicolette and Randy testified that they believe high quality education is important. But they disputed what that meant for Eleanor.

The parties disagreed about enrolling Eleanor in preschool. After researching the top preschools in the area, Nicolette

enrolled Eleanor in a preschool in Omaha, which Nicolette also considered daycare. Nicolette testified that Randy had toured the facility and initially agreed to enrolling Eleanor there. Nicolette testified that 2 weeks after enrolling Eleanor, she received a letter from Randy saying that if Nicolette put Eleanor in preschool, Randy would "fight for custody." In response, Nicolette decided not to enroll Eleanor in preschool at that time. Later, however, Nicolette again enrolled Eleanor for one-half day per week after Randy agreed. Eleanor attended the preschool only during Nicolette's parenting time, and Nicolette paid the fee, in accordance with the temporary order, which required her to pay for daycare expenses accrued during her parenting time.

Both parties testified that Randy asked Nicolette to include him as an emergency contact and a parent on Eleanor's preschool paperwork, but Nicolette refused. Nicolette explained that she had not included Randy, because the paperwork did not require it and because she was concerned that Randy would interfere with Eleanor's enrollment, after he alternately agreed and disagreed to it.

Randy testified that he had agreed that the preschool Nicolette had chosen was a good facility, but he also expressed to Nicolette that he did not believe Eleanor should attend preschool "two years in a row." He stated that Nicolette enrolled Eleanor despite his opinion, giving him less than 12 hours' notice. He opined that at the time of trial, he did not believe Eleanor's attendance was "hurting anything," but that he did not like Nicolette's choosing to enroll her without his complete agreement and without giving him time to process the issue.

Nicolette and Randy also disagreed about where Eleanor should attend elementary school. Nicolette preferred Millard Public Schools in Omaha, where she had attended, based on her research of the relative strength of the schools compared to other area schools, including Blair Community Schools. Nicolette's research was received into evidence. Randy wanted Eleanor to attend an elementary school in Blair which was

located less than a block from his home. Randy presented documentary evidence showing Blair Community Schools to be essentially comparable to Millard Public Schools.

*Communication and Contact.*

The evidence showed that sometimes, the parties had difficulty communicating about Eleanor. Each party testified that at times, it had been difficult reaching the other party. But Randy admitted that at the time of trial, he had not had recent problems contacting Nicolette, and Nicolette admitted that Randy returns her calls and texts.

Randy testified that since the parties separated, there have been issues with the parenting time schedule. He stated that he frequently asks for extra time with Eleanor and that Nicolette has generally refused, even though there were occasions when he offered extra visitation to Nicolette. Nicolette testified that Randy had expressed that the temporary custody order was not fair, because Nicolette received more time with Eleanor, but that Nicolette abided by the temporary custody order and refused to change the parenting time schedule.

According to Randy, 2 weeks before he was scheduled to take Eleanor on a vacation they had agreed upon in a mediated parenting plan, Nicolette refused to allow it, because, Nicolette said, Randy was not allowed to take Eleanor out of state. Randy testified that Nicolette later said she would allow Randy to take Eleanor on vacation if he agreed to terms that they had not agreed upon at mediation. Nicolette testified that although she had agreed to the vacation time at mediation, the parenting plan had not been signed, implying that it was not binding. Later at trial, she explained she was concerned that Randy was a "flight risk" after she received his "threatening" letter about "fighting for custody."

Regarding cooperation, Randy testified that Nicolette talks to him about decisions concerning Eleanor but that ultimately, Nicolette decides on her own. He stated that Nicolette does not give him time to process the matter before she acts.

*District Court's Findings and Order.*

After the parties presented their evidence, the district court summarized its findings and conclusions on the record. The district court stated the positive and negative aspects of each party's parenting and behavior and ultimately awarded sole legal and physical custody to Randy.

The district court found that both parties were loving parents who had been adequate caretakers. It also remarked that each parent had an "extremely positive" family support system. Regarding Randy's alcohol consumption, the district court stated that it was "very concerning," while noting evidence that Randy was "over the hump" and had "turned the corner" and remarking that "six or seven beers a night is inappropriate when you have a child. That should be your main focus." Still addressing Randy, the district court expressed concern that "you do consume and drive a car with [Eleanor]" and questioned whether that was "a good idea." It characterized Randy's driving a boat when he has been consuming alcohol as a "bad choice," though the court stated that it could not discern from the photographs offered by Nicolette whether Randy was drinking alcohol and operating the boat with Eleanor on board. The district court also acknowledged the safety concerns with Randy's residence and that some of those concerns had not been fixed until after Randy filed suit.

The district court remarked that although Nicolette was getting treatment for her mental health issues, she made a poor decision to consume alcohol while taking her medication. The district court considered Nicolette's prior hospitalization and the side effects of her current medication, including that Nicolette "sleep[s] a lot." And the district court was "astounded" that Nicolette allowed Eleanor to play with empty pill bottles.

The district court concluded joint legal custody was not an option because of the parties' difficulty communicating with one another and having "too many differences of opinion." The district court expressed concern over whether Nicolette "would

support parenting time between [Eleanor] and [Randy]." In particular, the district court observed that it believed Randy would "support [Nicolette] more in regard to extra parenting time or this or that." It noted that Nicolette had not allowed Randy to take Eleanor on vacation; that Nicolette did not give Randy much "extra time" with Eleanor; that Nicolette refused to include Randy on the preschool paperwork; and that both parties' proposed parenting plans gave her parenting time on Eleanor's birthday every year, which Nicolette said Randy had offered to her. Further, the district court expressed concern about Nicolette's view of the importance of Randy in Eleanor's life. It perceived Nicolette to be "controlling" and not "a reasonable person when it comes to giving parenting time to [Randy]," but, rather, someone who would "follow the letter of the decree only and there won't be any exceptions."

The district court concluded the hearing by discussing child support and the proposed parenting plans with the parties. As to parenting time, the district court took into consideration Eleanor's school schedule and the parties' work schedules, while noting that the parties live in different communities, making it impractical to award Nicolette significant parenting time during the week once Eleanor started kindergarten. It encouraged the parties to deviate from the parenting plan by agreement as needed. The district court invited the parties to submit additional suggestions concerning parenting time for its consideration before entry of the decree.

In the decree, the district court determined Nicolette and Randy to be Eleanor's biological parents. It ordered that it was in Eleanor's best interests to be in Randy's legal and physical custody and established parenting time and child support accordingly. Specifically, the district court ordered that until Eleanor began kindergarten, the parents would follow a 50-50 parenting time schedule. The district court further ordered that once Eleanor began kindergarten, Nicolette would essentially receive parenting time one weekday evening, every other weekend, 2 weeks in the summer, and alternating holidays. The

district court did not make special written findings pursuant to Neb. Rev. Stat. § 43-2932 (Reissue 2016).

Nicolette timely appealed.

## ASSIGNMENTS OF ERROR

Nicolette assigns, condensed and rephrased, that the district court erred in (1) not imposing limitations on Randy's custody and visitation rights and not making special written findings that such limitations would sufficiently protect Eleanor from harm pursuant to § 43-2932, (2) awarding sole legal and physical custody of Eleanor to Randy subject to Nicolette's parenting time, and (3) ordering Nicolette to pay Randy child support.

## STANDARD OF REVIEW

[1,2] An appellate court reviews child custody determinations de novo on the record, but the trial court's decision will normally be upheld absent an abuse of discretion. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

[3] Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court's determination. *Id.*

## ANALYSIS

*Compliance With § 43-2932.*

Nicolette's primary argument on appeal is that the district court's award of custody to Randy failed to comply with § 43-2932. Before addressing Nicolette's arguments, we briefly summarize relevant portions of the statute.

The statute has three basic parts that are relevant to this appeal. The first, subsection (1)(a), identifies when the statute applies. The statute applies "[w]hen the court is required to develop a parenting plan" and a "preponderance of the evidence demonstrates" that "a parent who would otherwise be

allocated custody, parenting time, visitation, or other access to the child under a parenting plan" has engaged in specified conduct including, relevant to this appeal, child abuse. See § 43-2932(1)(a).

The second part of the statute relevant to this appeal is in subsection (1)(b). It directs courts to impose limitations on a parent's custody and parenting time if a parent is found to have engaged in any of the conduct listed in subsection (1)(a). The court must impose limits that "are reasonably calculated to protect the child or child's parent from harm." § 43-2932(1)(b). The statute then provides a nonexhaustive list of potential limitations.

Finally, subsection (3) requires an additional step a court must take before awarding legal or physical custody of a child to a parent found to have engaged in any of the conduct listed in subsection (1)(a). "[T]he court shall not order legal or physical custody to be given to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose under [subsection (1)(b)]." § 43-2932(3).

Nicolette relies on each of the three parts of § 43-2932 summarized above. She contends that she demonstrated that Randy committed child abuse under subsection (1)(a)(i) and that the district court was therefore obligated by subsections (1)(b) and (3) to impose limitations on Randy's rights concerning Eleanor and to make special written findings that those limitations were sufficient to protect her from harm. See § 43-2932. She contends that the district court's failure to impose limitations and make special written findings constitutes reversible error.

[4] The district court did not impose any limitations on Randy's custody of Eleanor, let alone make special written findings that such limitations would protect Eleanor from harm. Neither did the district court explicitly find that § 43-2932 did not apply. However, we presume in a bench trial that the judge was familiar with and applied the proper rules of law unless it clearly appears otherwise. *Molczyk v. Molczyk*,

285 Neb. 96, 825 N.W.2d 435 (2013). We thus presume that the district court did not impose limitations or make special findings because it found § 43-2932 did not apply. And, for reasons we will explain, we find no basis to reverse the district court's determination that neither limitations nor special findings were required in this case.

Nicolette points to specific evidence introduced at trial and claims this evidence demonstrated that Randy committed child abuse for purposes of § 43-2932(a)(1). In particular, Nicolette claims that evidence Randy drove with Eleanor in the car after drinking and verbally abused Nicolette in Eleanor's presence demonstrated that Randy committed child abuse.

Randy responds to this evidence in two ways. First, he contends in his brief that it is immaterial, because no evidence was introduced that he was convicted of child abuse. Alternatively, he argues that the evidence Nicolette points to does not establish that he committed child abuse.

Randy's first argument can be dispensed with quickly. Section 43-2932 provides no indication that it applies only when one parent has been criminally convicted for engaging in the specified conduct. The statute is triggered if a preponderance of the evidence demonstrates that the parent engaged in the specified conduct. No mention is made of a criminal conviction. The only way we could conclude that § 43-2932 is triggered by criminal convictions alone would be to read meaning into the statute that is not reflected in its text, but we do not interpret statutes in that manner. See *State v. Garcia*, 301 Neb. 912, 920 N.W.2d 708 (2018).

Having determined that § 43-2932 can apply even in the absence of a criminal conviction, we proceed to consider whether the evidence demonstrated that Randy committed child abuse. Section 43-2932 is a part of the Parenting Act. The Parenting Act defines "child abuse or neglect" by reference to Neb. Rev. Stat. § 28-710 (Reissue 2016), a criminal statute. See Neb. Rev. Stat. § 43-2922(5) (Reissue 2016). Section 28-710(2) defines child abuse or neglect as follows:

(b) Child abuse or neglect means knowingly, intentionally, or negligently causing or permitting a minor child to be:

(i) Placed in a situation that endangers his or her life or physical or mental health;

(ii) Cruelly confined or cruelly punished;

(iii) Deprived of necessary food, clothing, shelter, or care;

(iv) Left unattended in a motor vehicle if such minor child is six years of age or younger;

(v) Sexually abused; or

(vi) Sexually exploited . . . .

Nicolette argues that by drinking and driving with Eleanor in the car and using harsh language toward Nicolette and physical aggression in Eleanor's presence, Randy placed Eleanor "in a situation that endanger[ed] . . . her life or physical or mental health." See § 28-710(2)(b)(i). As we will explain, however, the evidence that Randy actually placed Eleanor in danger is not as clear as Nicolette contends.

Nicolette did testify that she saw Randy "drink to excess" and then drive his car with Eleanor as a passenger. Nicolette did not explain what she meant by her testimony that Randy drank "to excess." In any event, Randy provided contrary testimony. He testified that he had driven with Eleanor in the car after having "[a] drink, maybe two, over the course of three, four hours," but he specifically denied ever driving while intoxicated with Eleanor. As for evidence of verbal abuse, Nicolette testified that Randy had previously, in the presence of Eleanor, yelled at Nicolette, called her a "bitch," and kicked and thrown objects around the room in anger.

On this record, we cannot say that the district court erred by not applying § 43-2932. Nicolette and Randy provided conflicting testimony on whether Randy ever drove while intoxicated with Eleanor in the car. Both parties acknowledge that under these circumstances, it is appropriate for this court to give weight to the fact that the trial judge heard and saw the

witnesses and was in a position to accept one version of the facts rather than another. See *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). The parties disagree, however, over which way that familiar principle cuts under these circumstances.

Nicolette contends that because the district court expressed concern that Randy would consume alcohol and drive with Eleanor as a passenger and questioned whether it was a "good idea," the district court must have accepted her testimony as credible. We disagree. We believe the district court's remarks and its decision not to apply § 43-2932 are most sensibly understood as reflecting that the district court accepted Randy's testimony that he did not drive while intoxicated with Eleanor as a passenger but was still concerned that Randy's decision to drive after drinking a small amount over several hours may not have been prudent in light of his history of alcohol use, even if it did not rise to the level of child abuse. And we do not believe the district court erred by concluding that the level of drinking to which Randy admitted—one or two drinks over the course of 3 or 4 hours prior to driving with Eleanor as a passenger—did not amount to child abuse.

As for the claimed verbal abuse and physical outbursts, we again find that the district court did not err by not applying § 43-2932. Nicolette's testimony regarding Randy's displays of anger does not portray admirable behavior on his part, but neither does it establish that the behavior endangered Eleanor's physical or mental health and thus rose to the level of child abuse.

*Legal and Physical Custody.*

Nicolette also argues that even if § 43-2932 is not considered, the district court's decisions on custody and parenting time amounted to an abuse of discretion. Nicolette contends that the district court, in awarding sole legal and physical custody to Randy, improperly punished her for what she calls "perceived inflexibility" regarding parenting time. Brief for appellant at 26. She also argues that the district court should

have granted her more parenting time than it did. We address these arguments in turn.

In the course of stating its findings on the record after the trial, the district court expressed concern over, among other things, whether Nicolette "would support parenting time between [Eleanor] and [Randy]." The district court went on to identify specific evidence adduced at trial that prompted this concern. The court mentioned one instance in which Nicolette initially agreed to make an exception to the parties' stipulated temporary parenting plan and allow Eleanor to accompany Randy on a vacation, but then withdrew that permission. It also expressed concern that if Nicolette was given custody, it did not appear she would be "a reasonable person when it comes to giving parenting time to [Randy]," but instead she would "follow the letter of the decree only and there won't be any exceptions." Nicolette points to these remarks by the district court, contending that the district court improperly punished her for her desire to follow the stipulated temporary parenting plan and its perception that she would also follow the final parenting plan adopted by the court.

Contrary to Nicolette, we do not believe the district court has "punished" Nicolette for her desire to follow either the temporary or final parenting plan. Rather, we understand the district court's remarks to express concern about how supportive Nicolette would be of Randy's involvement in Eleanor's life if she were granted custody. We believe that is a valid consideration in determining custody. See *Coffey v. Coffey*, 11 Neb. App. 788, 798, 661 N.W.2d 327, 340 (2003) ("it is appropriate to consider which parent would better promote visitation and a positive relationship between the children and the other parent"). And, given the evidence in the record, we cannot say that the district court's conclusion that Randy would be more supportive of Nicolette's parenting time than vice versa amounted to an abuse of discretion.

Neither do we believe that the district court abused its discretion as to the parenting time it awarded to Nicolette. Once Eleanor begins school, the district court's decree gives

Nicolette weekend parenting time with Eleanor every other Friday through Monday, with 3 hours of evening parenting time each week in addition to alternating holidays and 2 weeks in the summer. Nicolette contends that with only one evening of parenting time during the week, the court's parenting plan has reduced her to a "'weekend' or 'sometimes' parent." Brief for appellant at 23. As the district court noted, however, the commute between the parties' respective homes in different communities presented practical difficulties in awarding Nicolette more parenting time during the week. Nicolette points out that the specific distance between their residences was not in the record. But the record is clear that Randy lives in Blair and that Nicolette lives in the Millard area. We cannot say that the district court abused its discretion by considering the difficulties presented by the parties' living in different communities and fashioning its award of parenting time accordingly.

*Child Support.*

Finally, Nicolette contends that the district court erred by ordering her to pay child support to Randy. Nicolette's argument that the district court's child support order should be reversed is dependent, however, on her claim that the district court should have awarded sole legal and physical custody of Eleanor to her. Having concluded that the district court did not abuse its discretion by awarding sole legal and physical custody of Eleanor to Randy, we see no basis to reverse the district court's award of child support.

## CONCLUSION

For the foregoing reasons, we affirm the order of the district court that awarded sole legal and physical custody to Randy.

AFFIRMED.

HEAVICAN, C.J., participating on briefs.