IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STROEBELE V. VAUGHAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KAREN E. STROEBELE, NOW KNOWN AS KAREN E. YORK, APPELLEE,

V.

JOHN R. VAUGHAN, APPELLANT.

Filed March 31, 2020.    No. A-19-704.

Appeal from the District Court for Douglas County: THOMAS A. OTEPKA, Judge. Affirmed.

Stephanie Weber Milone, of Milone Law Office, for appellant.

Mark T. Farrell, of Mark Farrell Law Offices, L.L.C., for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

PIRTLE, Judge.

## INTRODUCTION

John R. Vaughan (John) appeals from an order entered by the district court for Douglas County establishing paternity, custody and parenting time, and fixing child support obligations. We affirm the district court.

## BACKGROUND

Karen E. Stroebele, now known as Karen E. York (Karen), and John were romantically involved over two years, between September 2014 and the fall of 2016. The parties never married but after the relationship ended, Karen discovered she was pregnant. Karen was then 42 years old and was already the mother of two daughters, ages 16 and 8. In the early months of the pregnancy Karen explored various options, including adoption, but she did not share the fact she was pregnant with John. In February 2017 John "hacked into" Karen's email account and discovered she had been communicating with adoption agencies. Karen and John made efforts to reconcile over a two

- 1 -

week period in February 2017 but after concluding he could not convert to Karen's religion, they both agreed it was in their best interests to go their separate ways.

Karen had contact with John in March 2017 when he showed up at her door at 4 a.m. and needed a place to sleep after having been drinking. That was the extent of the contact between the two until after Karen delivered the baby over the Memorial Day weekend in 2017. Karen notified John of the birth by email, after the fact, since the baby was early and had to be delivered by emergency cesarean section. John was in Lake City, Iowa, visiting his parents when the notification arrived. Karen remained in the hospital from Saturday through the following Wednesday or Thursday and was then recovering at home through the end of July.

A temporary custody hearing was held August 22, 2017. Karen named the child Violet and gave her Karen's maiden name, in part because the child had been born on her late father's birthday and she wanted the baby to have her father's initials. Karen was awarded primary physical custody of Violet and visitation for John was ordered on Tuesdays and Thursdays from 4 to 6 p.m. and on alternating Saturdays between 10 a.m. and 5 p.m. Later in the proceedings John was granted holiday visitation which included overnight visitation. John was also ordered to pay $407 per month in child support. There was no dispute that John was the biological father of Violet.

On March 12, 2018, the parties were before the court to show cause why they both should not be found in contempt of the August 2017 temporary order. By this time John was in arrears on his child support obligation by $1,929, and Karen had refused to allow him some of his parenting time when John's visitation conflicted with her wedding and the parties could not reach an agreement about rescheduling John's visit. As part of its order the court established parenting time during various holiday periods. The parties were again before the court on September 14, 2018, to compel discovery and to continue the trial date. Both motions were granted.

On February 13, 2019, the parties proceeded to trial on custody, parenting time, and child support. John had acknowledged paternity. The court ordered Violet's birth certificate be altered to add John's name as the biological father. The court awarded the sole legal custody of Violet to Karen along with primary physical care and custody. John was ordered to pay $414 per month in child support and a parenting plan and holiday parenting schedule was adopted by the court.

ASSIGNMENTS OF ERROR

John assigns that the district court erred in (1) not awarding him custody of Violet; (2) not awarding him more parenting time; (3) requiring him to pay child support and ancillary expenses; (4) ordering him to have a separate bedroom for Violet in order to exercise overnight parenting time; (5) adopting the holiday parenting time schedule which was proposed by Karen; and (6) failing to order the child's surname be changed, or in failing to allow a change to the child's middle name, or both.

STANDARD OF REVIEW

Questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *State on behalf of Kaaden S. v. Jeffrey T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). A judicial abuse of discretion exists if the

reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## ANALYSIS

### CUSTODY

Under the Parenting Act adopted by the Nebraska Legislature, the concept of child custody encompasses both "legal custody and physical custody." "Legal custody" focuses entirely on decision making authority and is defined as "the authority and responsibility for making fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(13) (Reissue 2016). See, also, *State on behalf of Kaaden S. v. Jeffrey T., supra*.

"Physical custody" is defined by the Parenting Act as "authority and responsibility regarding the child's place of residence and the exertion of continuous parenting time for significant periods of time." § 43-2922(20). While the Parenting Act does not speak in terms of "sole" or "primary" physical custody, it contemplates that an award of physical custody will determine the child's primary residence and identify the parent who will exert "significant" and "continuous" parenting time over the child. See *id*. See, also, *State on behalf of Kaaden S. v. Jeffrey T., supra*.

The Parenting Act neither expresses nor suggests a default position favoring or disfavoring any particular custody arrangement, even one agreed to by the parents, and instead requires that all such determinations be based on the best interests of the child. *Id.* We review the district court's findings that sole legal and physical custody with Karen is in the child's best interests for an abuse of discretion, mindful that the court heard and saw the witnesses and accepted one version of the facts rather than another.

When determining the best interests of the child in deciding custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. Neb. Rev. Stat. § 43-2923(6) (Reissue 2016). See, also, *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006).

The district court observed both parents over the course of three separate hearings, one of which found each of them to be in contempt of a prior order. At the show cause hearing the court found John to be in arrears on his child support obligation and found Karen to be in violation of a prior visitation order. The show cause order was entered when the child was 11 months old. By the time the trial was held the child was 20 months old.

During the trial Karen testified that she works as an insurance agent and her adjusted income for 2017 was $33,575. The court heard testimony from John that the day before trial started, he borrowed money from his parents to settle his $3,554 child support arrearage. John

testified he has "four or five jobs" but earns less than $18,700 per year and that he had not filed income tax returns for either 2017 or 2018.

Karen typically works 35 hours per week so she has the flexibility to pick up her older children from school. It is not clear how many hours per week John works but his "busy time" is over the Fourth of July and New Year holidays since he does "pyrotechnic" displays.

Karen married Doug York in July 2018. This is Karen's second marriage. Karen and Doug purchased a three bedroom home together in August 2018 and she lives there with Doug, Violet, and her 8-year-old daughter. Her 16-year-old daughter primarily lives with Karen's first husband, because he lives closer to the daughter's school "and he bought a car for her." The 16-year-old daughter visits Karen's home every other weekend and on holidays.

John testified he lives in a one-bedroom loft apartment and sometimes Violet's overnight visitation coincides with visitation with his 16-year-old son. John testified his relationship with his son has been strained in recent years since the boy has struggled with mental health issues and he pulled a knife on John prior to a hospitalization.

Karen testified communication with John is difficult. She often feels threatened since he is verbally abusive, disparaging, and belittling. Karen would prefer any communication between them about Violet be direct and to the point and just between them instead of including extended family and lawyers. John testified he includes his lawyer, his mother, and an email account he established for Violet when he communicates with Karen by email about Violet. His rationale for creating the email account for Violet was so someday she would know he was fighting for her. John testified he's sure the mother is saying bad things about him so he wants Violet to know the other side of the story. John also testified he reached out to Karen's ex-husband to ask him to do some internet research on Karen's current husband since the ex-husband is in "tech" and "very good with the internet." John testified he reached out to two of the current husband's ex-wives for information about whether he had been abusive during their marriages. John testified he had text message conversations with Karen's ex-husband about Violet and her whereabouts, when Violet should not have been any of the ex-husband's concern.

Karen testified she makes Violet's medical appointments and she takes her to the appointments. Karen acknowledged she failed to notify John of an appointment following a particularly abusive conversation with John because she did not want to be in a confined space with him.

Karen testified she was seeking sole legal and physical custody of Violet because she did not believe she and John could agree on how to handle three major issues: school, health, and religion. Karen testified she is a member of the Church of Latter Day Saints and John disparages her beliefs. Karen testified John tried to have Violet baptized in the Lutheran church during his visitation and Karen objected. John testified while he is Christian, he is a "holiday Christian, Easter, Christmas."

Karen testified she remarried in July 2018 and her new husband is also a member of the Latter Day Saints. Karen testified her older girls have a loving relationship with Violet and that her husband "adores" Violet. Karen's husband is employed by the Army Corps of Engineers and he provides health insurance coverage for Violet.

Karen testified she is concerned about Violet's re-adjustment when she returns from visitation with John. Karen testified it takes several days for Violet to resume sleeping through the night and that she always comes home "with candy." Karen also testified that at the time of trial Violet comes home with dirty diapers "three or four times" a month, including "yesterday."

After observing the witnesses and considering the testimony and other evidence, the court found Karen to be a fit and proper person and that she should be awarded sole legal and physical custody of Violet, subject to parenting time for John as follows:

a. [John] shall have parenting time with the minor child every Tuesday from 4:00 p.m. until 6:00 p.m. until the child begins attending school. [John] shall then have parenting time every Tuesday from the time the child is released from school (or 4:00 p.m. if school is not in session) until 7:00 p.m. that same night.

b. On alternating weekends, [John] shall have parenting time with the minor child from 4:00 p.m. on Friday until Sunday at 6:00 p.m. However, overnight visitation should not be permitted unless [John's] residence has a separate bedroom for the minor child.

c. The party that is commencing parenting time with the minor child shall pick up the minor child.

d. The parties may also exercise such other parenting time as they may mutually agree.

On this record we cannot say, after considering the best interests factors spelled out in the Parenting Act, that the district court erred in its finding or abused its discretion in awarding sole legal and physical custody of Violet to Karen.

PARENTING TIME FOR JOHN

The Parenting Act also provides that the best interests of a child require a parenting plan that provides for a child's safety, emotional growth, health, stability, physical care, and regular school attendance and which promotes a child's continued contact with his or her families and parents who have shown the ability to act in the child's best interests. *State on behalf of Kaaden S. v. Jeffrey T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). In addition to considering these statutory factors, Nebraska case law instructs that when making determinations as to the allocation of parenting time that is in a child's best interests, a trial court should also consider the parties' ability to communicate on issues such as transportation, homework, discipline, medical and dental appointments, and extracurricular activities. *Id.* Other relevant considerations include stability in the child's routine, minimizing conflict between the parents, and the general nature and health of the individual child. *Id.* The fact that one parent might interfere with the other's relationship with the child is also a factor to consider, but is not a determinative factor. *Id.*

One of the factors the Nebraska Supreme Court considers when analyzing whether there has been an abuse of discretion in the award of parenting time is whether one parent is more likely than the other to promote visitation and a positive relationship between the child and the other parent. Given the evidence in the record, we cannot say that the district court's conclusion that Karen would be more supportive of John's parenting time than vice versa amounted to an abuse of discretion. See *Randy S. v. Nicolette G.*, 302 Neb. 465, 924 N.W.2d 48 (2019).

Karen testified there had been several occasions when she tried to accommodate John's schedule so he could have his visitation and she was willing to adjust Saturday visitation by "push[ing] things back an hour" to 10 a.m. to 5 p.m. Karen was willing to permit visitation with the newborn Violet for John's parents when they traveled to Omaha from Lake City so long as their initial meeting was held in Karen's home. John, on the other hand, was unwilling to adjust his visitation to permit Karen to take Violet with her for her marriage to Doug, so Karen acknowledged she violated the temporary custody order by taking Violet to Utah during John's weekend. And, John tried to baptize Violet during his visitation when he admits religion is not as important to him as it is to Karen. We believe the court's parenting time order was entered in order to reduce conflict between the parents and to protect the health and wellbeing of the child. We find no error in the court's parenting time award.

## CHILD SUPPORT AND ANCILLARY EXPENSES

John argues the court was wrong to award Karen sole legal and physical custody, and therefore, the court should recalculate and reapportion its child support award based on an award of sole legal and physical custody to him. Since we have already found no abuse of discretion by the district court with regard to its decision to award Karen legal and physical custody, we need not address this assigned error further. See *Lang v. Howard County*, 287 Neb. 66, 840 N.W.2d 876 (2013) (an appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it).

## OVERNIGHT PARENTING TIME

The court ordered John to provide a separate bedroom for Violet before he would be able to have overnight visitation in his apartment. John testified his apartment is a "loft" and defined spaces are created with moveable screens. John testified he has a crib and a toddler bed for Violet in his sleeping space. He also testified his visitation with his 16-year-old son sometimes coincides with his visitation with Violet and when the son sleeps over he is on a pull-out sectional in the living space. Violet shares a bedroom with her 8-year-old sister when she is in her mother's home.

A visitation schedule is generally considered reasonable if it provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002).

The court ordered overnight visitation on alternating weekends between the hours of 4 p.m. on Fridays through 6 p.m. on Sundays. The overnight visitation was contingent upon a separate sleeping space for Violet. John argues that portion of the order which requires him to provide a separate sleeping space for Violet was an abuse of the court's discretion. We disagree since we believe the court could have concluded the communal arrangement was not in this toddler's best interests for a variety of reasons. John testified Violet's visitation sometimes overlapped with his 16-year-old son, and this could certainly cause privacy issues as Violet ages and starts to mature. Another reasonable consideration is that a toddler may need a quieter place to sleep than what a loft can provide. Notably, there was evidence of Violet not sleeping well upon return from visitation which could indicate the situation at John's house was, perhaps, a bit chaotic. While the

court's order that John provide a separate sleeping space for Violet may be atypical, we cannot say in this case it was an abuse of discretion.

Additionally, the alternating weekend visitation does not require John to forfeit his daylight visitation with Violet if he is unable to provide a separate sleeping space. We believe the "contingent" alternating weekend visitation still fosters a relationship between John and Violet and is therefore not an abuse of the court's discretion. We affirm that portion of the court's order that John provide separate sleeping space for Violet.

HOLIDAY PARENTING TIME

Karen proposed holiday visitation which "mirrors" the visitation schedule she has with her ex-husband and her older daughters. Brief for appellee at 17. Karen's proposal permits Violet to continue to enjoy her relationship with her half-sisters which was a reasonable consideration for the court. John points out he will have a difficult choice to make in alternating years since his holiday visitation falls on the "busy times" in his fireworks business. Brief for appellant at 29. John proposed a holiday visitation plan which limited visitation to Easter, Memorial Day, Labor Day, and Thanksgiving in either even or odd numbered years. His plan proposed he have Violet every year for four days at Christmas.

The court heard evidence that Karen had made efforts to accommodate John when he needed to reschedule visitation with Violet. The court also heard evidence that John had not been as willing to accommodate Karen. We note John's suggestion that the court somehow shirked its independent duty to assess what is in the child's best interests when adopting the holiday visitation plan and we are not persuaded that is the case. We find no abuse of discretion in the court's holiday order.

NAME CHANGE

John asked the court to change Violet's surname from "Hall" to "Vaughn." Violet's birthday was the same day as Karen's father, who had died, so in naming the baby Karen sought to honor her father. Karen gave the baby first, middle, and last names which would be the same initials as her father's full name. John's rationale for seeking to change Violet's last name, or her middle name, or both was his belief that his child "deserved" to have his last name and his desire to protect Violet from awkwardness in having to "explain[] why her last name differed from those of her biological parents." Brief for appellant at 19.

When both biological parents have opposing views on what the child's name should be, the question for the court is whether the best interests of the child support a name change. While custody does not confer a special advantage for Karen in assessing whether a name change is appropriate, custody, along with the other factors, is to be considered in determining the best interests of the child. See *State on behalf of Connor H. v. Blake G.*, 289 Neb. 246, 856 N.W.2d 295 (2014). These other, nonexclusive factors include (1) misconduct by one of the child's parents; (2) a parent's failure to support the child; (3) parental failure to maintain contact with the child; (4) the length of time that a surname has been used for or by the child; (5) whether the child's surname is different from the surname of the child's custodial parent; (6) a child's reasonable preference for one of the surnames; (7) the effect of the change of the child's surname on the

preservation and development of the child's relationship with each parent; (8) the degree of community respect associated with the child's present surname and the proposed surname; (9) the difficulties, harassment, or embarrassment that the child may experience from bearing the present or proposed surname; and (10) the identification of the child as a part of a family unit. *Id.* It is the burden of the party seeking the change in surname to prove that the change in surname is in the child's best interests. *Id.* Cases considering this question have granted a change of name only when the substantial welfare of the child requires the name to be changed. *Id.*

John argues Karen's misconduct in keeping news of the pregnancy from him and exploring whether adoption was an option militate in favor of a name change. He acknowledges he was in arrears on his child support obligation prior to trial but he settled the debt in an effort to diffuse any advantage Karen might have. There was no evidence on Violet's preferences or whether a change would have any impact in the community. The fact that "Hall" has been Violet's name since birth militates in favor of leaving well enough alone. There was no evidence that Violet could expect harassment or embarrassment, or a sense of alienation since her name was different from both biological parents. But we are not unmindful that this consideration has been identified before. (Cf. *In re Change of Name of Slingsby*, 276 Neb. 114, 752 N.W.2d 564 (2008); in case where mother sought to change child's name from former husband's name to current husband's name testimony by child psychologist noted child would not necessarily identify more closely with newly formed family). As in *Slingsby*, there is no evidence here, professional or otherwise, that Violet will be unable to identify herself as part of a family unit without a name change.

We do not believe John has proved the substantial welfare of the child requires a name change. Therefore, finding no abuse of discretion, we affirm the order of the district court.

CONCLUSION

Our de novo review of the record does not reveal an abuse of discretion by the district court. Accordingly, we affirm the district court's order in its entirety.

AFFIRMED.