IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATTLER V. DAVENPORT


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


KARI L. STATTLER, APPELLEE,

V.

BRYSON P. DAVENPORT, APPELLANT.


Filed March 31, 2020.    No. A-18-841.


Appeal from the District Court for Phelps County: TERRI S. HARDER, Judge. Affirmed.

Joel Bacon and Tara L. Gardner, of Keating, O'Gara, Nedved & Peter, P.C., L.L.O., for appellant.

Bergan E. Schumacher, of Bruner, Frank & Schumacher, L.L.C., for appellee.


MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Kari L. Stattler and Bryson P. Davenport had two minor children in the course of their 14-year relationship. Following a trial focused primarily on custody of the children, the Phelps County District Court awarded the parties joint legal custody, with physical custody awarded to Kari. Bryson was ordered to pay child support. Bryson appeals the district court's order as to physical custody and child support. Finding no abuse of discretion by the district court, we affirm.

## II. BACKGROUND

Kari and Bryson are the parents of two minor children: Kinley Davenport (born 2010; age 8 at the time of trial) and Kyler Davenport (born 2013; age 4 at the time of trial). Kari and Bryson never married. Before January 2017, Kari lived in Lincoln, Nebraska, with Bryson, Kinley, Kyler, and Kalee (Kari's daughter from a different relationship; age 19 at the time of trial).

In January 2017, Kari's father unexpectedly died. For about 2 months, Kari traveled back and forth between Lincoln and Holdrege, Nebraska, where Kari's mother, Helen Geihsler, lived. Kari helped with finances, paperwork, and caring for Helen. Kari had been living at Helen's home in Holdrege since January, and decided to relocate there in March when she secured a job at a daycare nearby in Kearney, Nebraska. Kinley and Kyler remained living with Bryson in Lincoln. It was a "very hard decision" for Kari to decide she would primarily live in Holdrege, but in time she accepted that she "needed to stay close" to Helen, and her relationship with Bryson was "pretty unhealthy." She did not bring the children with her, in part, because she thought it was good for Kinley to stay in school. Aside from Kari and Helen, a 52-year-old disabled man named "Gary" "from Mosaic" also lived at Helen's home and had done so for about 6 or 7 years as part of a program that supported disabled individuals. Kalee moved out of Bryson's home around February, and by the time of trial she had relocated to Holdrege and also lived in Helen's home. Kari said her relationship with Bryson was "back and forth" for "quite some time from well before [she] left [Lincoln]."

On January 2, 2018, Kari filed a complaint to establish paternity, custody, and child support, alleging that Bryson was the father of Kinley and Kyler. In February, Bryson filed an "Answer and Cross-Complaint"; under his "Cross-Complaint," Bryson admitted he was the father of Kinley and Kyler, asserted that they had resided with him in Lincoln since birth, and that he was fit to have custody of them. He also filed a motion for an order granting him temporary custody of the children and for temporary child support.

After a hearing, the district court entered a temporary order in March 2018. It found it was in the best interests of the minor children to remain in the temporary custody of Bryson. It found it was not in the best interests of Kinley for her to transfer to the Holdrege School District in the middle of the spring semester and that, as to Kyler, the Nebraska Supreme Court "has made it clear it does not approve of siblings being separated except in rare cases." And, Kari had her "hands [full] . . . with employment and caring for her seriously ill mother and a handicapped man." Kari was ordered to pay temporary child support of $300 per month beginning in June because she had been "paying the bills over the winter as [Bryson had] been seasonally unemployed." The June and July child support would be reduced by 50 percent "when [Kari] exercises her summer [parenting time]." Parenting time provisions were set forth, including alternating weekend and holiday parenting time. The order directed that Kari "shall have the children for the months of June and July 2018," with Bryson receiving alternating weekends.

Trial took place on August 1, 2018. Kari and six other witnesses testified on Kari's behalf. Bryson and his mother, Sherry Morgan, testified on Bryson's behalf. Numerous exhibits were received into evidence. We will discuss the evidence in our analysis where relevant to the issues on appeal. At the conclusion of trial, the district court stated:

> All right. I am aware that we're approximately two weeks from most school districts probably in the state commencing this school year. And so let me just speak to custody at this point because I'm pretty clear in my mind as to what I'm going to do.
>
> I think this is a case that I often refer to as nobody doubted that you could but you didn't kind of case. I think this is clearly a case where until January of '17 mom was the one who did the heavy lifting. Not that dad didn't do anything. Nobody is -- I'm not

certainly saying that. But [Bryson's counsel] talked about a division of responsibilities; and I don't think it was a very even division, if that is what it was.

It's clear to me that mom was the primary caregiver. I think it would be in the best interest[s] of these children to be with mom.

It granted "custody" to Kari, starting August 10. There was no distinction between legal and physical custody, something noted in the later order. The remaining matters were taken under advisement.

On August 7, 2018, the district court entered an order, finding that Bryson was the father of Kinley and Kyler. It stated that the parties were awarded "joint care custody and control of the minor children," with "physical care custody and control" awarded to Kari subject to Bryson's parenting time set forth in an attached parenting plan (alternating weekend parenting time and mostly alternating holidays; and summer parenting time during June and July for Bryson, subject to Kari's alternating weekend parenting time on the same terms Bryson followed the rest of the year).

Starting in September 2018, Bryson was ordered to pay child support of $638 per month for both minor children (reducing to $439 for one child), subject to an automatic 50-percent abatement during June and July each year unless Kari submitted an objection stating that Bryson failed to exercise his summer parenting time. Bryson was ordered to pay 57 percent of employment- or education-related daycare expenses. Other matters such as cash medical support, health insurance and unreimbursed medical expenses, and tax deductions were set forth in the order. The costs of the action were charged to Kari. Each party had to pay their own attorney fees.

Bryson appeals.

## III. ASSIGNMENTS OF ERROR

Bryson claims, consolidated and restated, the district court erred in not awarding sole physical custody of the children to him rather than Kari, and therefore also erred in ordering him to pay child support.

## IV. STANDARD OF REVIEW

Child custody and child support determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. See, *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015); *State on behalf of Fernando L. v. Rogelio L.*, 299 Neb. 329, 907 N.W.2d 920 (2018). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Schrag v. Spear, supra*. A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

## V. ANALYSIS

### 1. CHILD CUSTODY

Bryson claims the district court abused its discretion by awarding physical custody of Kinley and Kyler to Kari. He disputes both the district court's legal analysis and its custody determination based upon the evidence in this case.

When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) states, in pertinent part:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member . . . ; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

### (a) District Court's Legal Analysis

Bryson asserts that the district court "made it clear that the only factor it had considered was which parent was the primary caregiver before January 2017." Brief for appellant at 14. Bryson argues that Nebraska has "long rejected a per se rule that physical custody should be awarded based on who was the primary caregiver." Reply brief for appellant at 2. Bryson's argument is based on his interpretation of the district court's statements at the close of trial, which we noted previously, and its order being "silent" on why it awarded Kari physical custody. *Id.* at 14.

While the district court did find that Kari was the primary caregiver, which is a factor for consideration under § 43-2923(6), we disagree with Bryson that the court limited this finding to the care Kari provided only before January 2017 or that the district court focused only on this one factor rather than the overall best interests of the children. The district court noted that until January 2017, Kari was "the one who did the heavy lifting." But then the court also later stated, "It's clear to me that [Kari] was the primary caregiver." There was no time limitation placed on this final

observation. And in our de novo review of the record, it is evident that even though Kari moved her place of residence to Holdrege, she nevertheless still traveled regularly back to Lincoln and also, at least initially, kept Kyler with her in Holdrege for large blocks of time. In the summer of 2017, Kari and Bryson alternated parenting time on a weekly basis. And while it is true that for the 2017-18 school year the children were living in Lincoln, Kari was still managing or coordinating school, daycare, sports, and other activities for the children. Even Bryson acknowledged that Kari was a very active parent, and that even after she moved to Holdrege, she continued to pay household bills and he would contact her for daycare-related matters, including sometimes having Kari contact the daycare when Kyler was going to be absent. Kari continued to call and schedule appointments for the children, and if she could not make it back for the appointment, she would then ask Bryson to take them; "it was challenging; but [she] made it work."

Further, the district court stated on the record that "it would be in the best interest[s] of these children to be with [Kari]," which it reiterated in its subsequent written order. Although the order does not include any other findings explaining that decision, an appellate court presumes in a bench trial that the judge was familiar with and applied the proper rules of law unless it clearly appears otherwise. See *Randy S. v. Nicolette G.*, 302 Neb. 465, 924 N.W.2d 48 (2019). As we will discuss in more detail later, the evidence supports the district court's decision to award physical custody to Kari, and the decision is consistent with the children's best interests.

Bryson also claims the district court used the "wrong time period to determine which parent had been the primary caregiver." Brief for appellant at 11. He suggests that the district court should have focused on the 19 months between Kari's father's death in January 2017 and trial in August 2018, a time when Bryson asserts he was the primary caregiver, rather than the time period before Kari's father's death. Bryson points to a proposition relevant to modification proceedings that "[i]n determining whether the custody of a minor child should be changed, the evidence of the custodial parent's behavior during the year or so before the hearing on the motion to modify is of more significance than the behavior prior to that time." See *Schrag v. Spear*, 290 Neb. at 110, 858 N.W.2d at 876. He also relies on *State on behalf of Dawn M. v. Jerrod M.*, 22 Neb. App. 835, 861 N.W.2d 755 (2015), which he suggests provides that the above-cited proposition from *Schrag v. Spear, supra*, guides the "proper timeframe" in determining which individual was the primary caregiver in cases such as this where permanent custody had never been previously decided. Brief for appellant at 17.

However, as we have already discussed, even when considering the period of time after Kari relocated to Holdrege, the evidence supports that Kari continued to engage in substantial parenting, and the district court's determination as to the best interests of the children was not limited to the pre-January 2017 time period. Although there is no question that the children were in the primary physical care of Bryson, particularly for the 2017-18 school year, there is also no question that Kari continued to be actively involved in helping to maintain the Lincoln household and overseeing the children's needs. We will discuss this in greater detail in the next section which sets forth the evidence supporting the physical custody decision.

(b) Evidence Relevant to Physical Custody Decision

Bryson argues that he should have been granted sole physical custody of Kinley and Kyler. He concedes that both he and Kari "are caring and loving parents and both are fit to have physical custody." Brief for appellant at 17. But he argues that in the 19 months before trial he had been the children's primary caregiver so keeping custody with him would have provided continuity and stability for the children. He adds that the children would have stayed in the home they had always known where they have their "own spaces" and that Kinley would have been able to attend the school she had always attended. *Id.* at 18. He states that there was evidence that when Kari first moved to Holdrege she put her personal interests above the children, leaving them at home overnight at her mother's house while staying elsewhere, but he acknowledges that "the situation has apparently stabilized." *Id*. He argues that giving him primary physical custody would maximize the amount of meaningful parenting time for each parent. Further, he is a seasonal landscaper and under the current parenting plan, his "primary parenting time is in the summer, which . . . is his busiest time of the year." *Id.*

In response, Kari argues that "[t]here was little testimony regarding the children's relationship with their father," and instead, Bryson's request for custody relied "heavily on the fact that he considered himself to be the primary caregiver for nineteen months before trial," which is an argument "contradictory to his own assertion that the primary caregiver standard should not be the only factor considered in determining custody." Brief for appellee at 10.

Both parties make fair arguments in support of their respective positions. However, our review of the evidence does not reveal any abuse of discretion by the district court in reaching its decision on physical custody.

*(i) Evidence Related to Kari*

At the time of trial, Kari was working at an elementary school in Holdrege as a "K-2 sped ed [sic] teacher," where she worked about 35½ hours per week for 9 months of the year. During the summer months, Kari worked approximately 25 to 30 hours per week at a daycare in Kearney as an assistant director and working "in rooms" as needed. Kari had worked in child care since 2005; she said that her work experience, including related courses and training (e.g. how to handle children with emotional needs and social needs), helped her parent her children. Kari had enrolled Kinley (entering third grade) and Kyler (entering preschool) in the Holdrege Public Schools. Kari would be transporting them to and from school each day since she would be working in the same building. Kari planned to ensure the children had a regular routine during the school year in Holdrege. Before moving to Holdrege, Kari attended parent/teacher conferences and school activities, including picnics, eating lunch with Kinley at school, and field trips; she said Bryson did not attend those activities. Kari planned to be just as active in Kinley's and Kyler's education in Holdrege as she had been in Lincoln.

Helen, Kari, Gary (from "Mosaic"), and Kalee lived in Helen's home in Holdrege, which Kari said was clean, had enough space, and was in a safe environment. Helen said the house had three bedrooms; Gary and Helen each had their own rooms and Kalee had her own room downstairs. Helen said Kinley would sleep with her most of the time and Kyler would sleep with Kari. Kari stated that there was enough room in the basement to make three bedrooms. One of

Kari's friends testified she had been to Helen's home which she believed appeared safe and had enough room for the children, saying she and her two children had stayed there the night before trial and they "all had room." Kari said the Holdrege home was much bigger than the Lincoln home. Kari estimated that per week she spent 30 minutes caring for Gary and a couple hours caring for her mother, which she felt did not limit her ability to parent her children. Helen testified that she did not require assistance around-the-clock. Kari thought she would be able to move out of Helen's home and still provide care to Gary and Helen. Kari intended to move from Helen's home within the next few months.

Kari had a support system in Holdrege, including Helen, Kalee, Kari's two brothers, friends in the area, and her boyfriend, Shawn B. (whom she began dating in October 2017). Kari indicated the children had positive relationships with Helen, Kalee, Gary, Shawn, and Shawn's daughter from a different relationship (6 years old at the time of trial). Kalee reported that Kinley and Kyler had made friends in Holdrege around the neighborhood, as opposed to Lincoln where there were "no[t] really kids around the neighborhood." Kari described how in Holdrege there are two parks and in Helen's backyard there is a pool. A friend of Kari's who lived in Holdrege at the time indicated that she and at least two out of three of her children (ages 19, 15, and 4) spent time "daily routinely" with Kari since Kari's move there.

Prior to Kari relocating, the children had previously been to Holdrege for holidays and some weekend visits. Kari said the children were familiar with Holdrege because they did a lot there, such as swimming in the "splash pad," going to the library, involvement in "Y activities," swimming lessons, "Y camps" for Kinley, softball (for Kinley), "T-ball" (for Kyler), and gymnastics. Kinley made friends through the "YMCA camps" who were also in softball and gymnastics. Kinley had participated in soccer and gymnastics in the past in Lincoln.

Regarding the time before her relocation in early 2017, Kari did not feel that responsibilities were shared between her and Bryson. She did the "majority of the stuff." Helen stated that Bryson "didn't participate and go anywhere with [Helen, Kari, Kinley, or Kyler]" except for eating "supper or lunch" with them. One of Kari's friends testified that Kari took care of "[e]verything from sunup to sundown. Bathing, getting clothes ready, doing laundry, dishes, taking care of the house [and] the kids." Kari said she took care of the children when they were sick, made all of their appointments (which Bryson admitted was usually the case), and transported them to those appointments. Kari named several past medical appointments for Kyler and remembered Bryson was present for just one of them, something Bryson disputed. Kari said she planned and did the work for the birthday parties, but Bryson testified planning those parties was a joint decision. Kari said she enrolled the children in their extracurricular activities in Lincoln and provided the majority of transportation to those activities. According to Kari, during Bryson's employment off-season (January and February), he did not take over any responsibilities.

From January up until March 2017, Kari recalled a schedule of being in Lincoln from Sunday through Wednesday or Thursday and taking Kinley to appointments and gymnastics and "different stuff like that" and then being back in Holdrege to assist her mother. While Kinley was in school, Kari would take Kyler for a whole week when Bryson's mother had to work, which happened "probably once or twice a month." Even after her move, Kari continued to plan and hold birthday parties for Kinley and Kyler. She said she mentioned to Bryson that he and his family

were more than welcome to come to Kyler's birthday party in September 2017 in Lincoln, but Bryson and his family did not attend. She said Kinley's birthday party in April 2018 was in Lincoln also, but Bryson did not participate in it. However, Bryson testified about having a "get together" with his family for Kinley's birthday that year and having a birthday party for Kyler in 2017 that mostly his family and Kalee attended. Kari said after her move she "still attended everything, mostly everything that [the children] did in Lincoln." For example, Kari recalled being at Kinley's first day of school for the 2017-18 school year. Kalee testified about how Kari had put Kinley and Kyler in sports and activities such as swimming lessons and how they went camping, fishing, and boating frequently in Holdrege.

Bryson did not know if he trusted Kari and said she had told him she was in a relationship with someone at the same time she was in a relationship with him. Kari said she was not in a relationship with Shawn and Bryson at the same time. Bryson also believed Kari had asked the children to lie for her before. Kari acknowledged that there were a few nights in the summer of 2017 when she spent the night elsewhere at a friend's house or Shawn's friends' house, which she regretted. Kari said that Helen was home with the children on those nights, and that she had not stayed anywhere without her children during her summer parenting time in 2018. Kari explained she was fired from a daycare in the past due to two children being left inside the building after a different worker had marked those children "out" that evening and Kari had not seen them during her closing duties. She had worked there for 11 years and obtained employment at daycares thereafter. She stated that was an isolated incident.

Both Kari and Bryson talked about relying on their own mothers to help care for Kinley and Kyler, although the evidence showed that Bryson's mother (Sherry) assisted Bryson to a greater extent. Kari said that while she worked during the summer, either Helen watched the children or Kari brought the children with her to the daycare where she worked.

As far as stability, Kari believed she was in a better financial position than Bryson due to Bryson's seasonal employment. Kari continued to help Bryson pay the bills for the Lincoln household even after she relocated to Holdrege. She continued to pay bills from January to December 2017, and into January and February of 2018.

When asked why she felt she could better promote the social welfare of the children, Kari described Bryson as a "homebody" and said that she and the children "always go out." Kari believed that compared to Bryson she was more in tune with the children's emotions. Kari would get "down on [Kinley's and Kyler's] level" and tell them it was "okay to be mad or sad." Kari felt her children communicated openly with her and showed her affection, and she showed them she loved them. Both Kari and Bryson indicated they reasonably disciplined their children.

Both parents submitted exhibits of photographs to highlight their time spent with the children. Kari described some of the events shown in her photographs, including attending a show at a park in Kearney, watching fireworks at a park in Lincoln, visiting a park, getting "nails done" with Kinley, eating out at restaurants, going to "the movies," circuses, fairs, zoos, the pumpkin patch, and a children's museum. She also showed photographs from a family vacation to Branson, Missouri.

*(ii) Evidence Related to Bryson*

Bryson was employed by a landscaping company (according to Kari, he "mows lawns, landscaping maybe"; "snow removal if he needed to"), but typically Bryson did not work during January and February. He opted to draw unemployment, and when asked if there was a reason he drew unemployment rather than gaining a part-time job, Bryson responded, "No. That's just my job." Regarding his off-season unemployment, Kari said Bryson would stay up late playing video games and sleep in most of the next day. He did not take over more household or parenting responsibilities during these periods of unemployment.

Kari described Bryson's parenting as "[p]retty absent." He "never really wanted to do a whole lot with [her] and the kids," and when they would ask him to do something with them, he would say "maybe next time." Kari explained this was "[b]ecause we would leave early in the morning and he liked to sleep in and play his video games." "[H]e was just a homebody. He just liked to stay home. Didn't really want to go out and participate." She claimed Bryson had never attended the annual family vacation that Kari, Kinley, Kyler, and Kalee took to Branson, although he had been invited. Bryson admitted he never went on the "Branson trip" but said that was during his busiest time of work.

Kari was concerned about Bryson's heavy daily marijuana use. She believed he was still smoking marijuana in January 2017. Kari said Bryson had been "high" around the children (something Bryson said was possible) in the past and that Kalee had discovered some of his marijuana once (something Bryson recalled). Kari admitted to using marijuana in the past before her children were born. Bryson did not deny smoking marijuana in the past but said he had last used marijuana about a year before trial.

Bryson stated that, as of trial, only Kinley and Kyler lived with him, that it was the same house they had always lived in, and that Kinley slept in her own bed in her room every night and Kyler slept sometimes in a "cot-type" bed or in Bryson's bed. According to Kalee, Bryson's house had two bedrooms.

Bryson said Kinley was already enrolled for the 2018-19 school year at the same school she had attended in kindergarten, first grade, and second grade. Bryson said Kyler had been in daycare part-time. Bryson acknowledged Kari was in charge of arranging daycare before she left. Bryson had taken some steps to secure a spot for Kyler in preschool at the same school Kinley attended, but at the time was waiting on some items to complete the process. Kinley had earned good grades at her school in Lincoln, according to both parties. Kari noted that Kinley missed some days of second grade (2017-18 school year); her report card showed about 5 absences and 1 tardy for that school year.

Bryson said Kinley would continue soccer and gymnastics in Lincoln. He signed Kyler up for "micro soccer," which would be the first time Kyler played that sport. Bryson's support system was comprised of his mother, his sister, his son from a different relationship (18 years old at the time of trial) whom Bryson said had a good relationship with Kinley and Kyler, and Bryson's girlfriend, whom he had met in October 2017.

Regarding Kinley's second grade school year (2017-18), Bryson said he attended the school carnival, wellness fair, and parent/teacher conferences. Bryson said his mother (Sherry)

helped transport Kinley to school during the 2017-18 school year and had taken Kyler to and from daycare. Bryson agreed he basically co-parented with Sherry, and that Sherry's help had been necessary since Kari's move. Kari said she was told that Sherry took the children to their doctors' appointments, however Bryson testified he had taken the children to the doctor in 2017 for common colds and Sherry took them to appointments if she had them that day so he would not have to take off work. Bryson said he took the children to some dental appointments but Sherry had handled that responsibility for a recent dental appointment. Bryson said he usually prepared breakfast for the children, but sometimes Sherry did that. Bryson said Sherry took care of the children after school sometimes and had taken them to different social activities like shopping or going to a trampoline park.

Kari testified about how even after she relocated, she was "still calling making appointments for [the children]" and if she could not make it to those appointments, she would ask Bryson to take the children to the appointments. Bryson acknowledged that even after Kari moved and up until 2018, he would contact Kari and ask her to reach out to the daycare for certain matters. Although Kari acknowledged that Bryson had "stepped up" since January 2017, she had concerns about his parenting. She agreed that usually the children appeared to be in clean clothes and fed when they would come into her care after being with Bryson. But in March 2018, she picked up the children on a "pretty chilly" day and Bryson "didn't bring any coats or jackets for them." She then bought winter coats for them. Another instance was a time when "Kinley was called in sick to school" and went to the doctor but did not have a fever; Kari questioned whether Kinley was sick when "later that day [Kinley and Bryson or Sherry] went shopping." And on Father's Day (June) after the children spent 3½ to 4 hours with Bryson at a water park, the children were sunburned, particularly Kyler. There was conflicting testimony from Kari and Bryson about each of their understandings that day regarding who was providing sunscreen for the children. Kari ended up having to take Kyler to a hospital burn unit to treat Kyler's blistered skin.

Bryson admitted that Kari kept him informed about the children when they were in her care. Kari planned to continue to promote a positive and strong relationship between the children and Bryson. During her 2018 summer parenting time, Kari shared videos through email and sent Bryson pictures of activities the children had done all summer long. Kari never told the children they could not call Bryson and she talked about how in some instances she suggested they call Bryson. She talked about how she was willing to be flexible with allowing Bryson to take the children under his care even if it meant that she had to give up "a weekend." According to Kari, whether that type of behavior was reciprocated with her depended on Bryson's mood. She said Bryson had called her derogatory names before, something Bryson generally admitted.

Bryson described photographs which showed Easter activities in 2017, Kalee's graduation, Kinley's friend's birthday party, his grandmother's birthday party that summer in Missouri, Kyler's recent birthday party which Bryson had planned, Kinley's first day of second grade in August, Halloween activities that year, the children playing in a pool in the front yard, Kyler at a play date with a friend, visiting an event at the Lancaster Event Center, Kinley participating in gymnastics, and the school carnival in 2018.

### (c) No Abuse of Discretion

The evidence reveals that overall Kari and Bryson each cared about and were capable of parenting Kinley and Kyler. Each parent expressed concerns about the other's moral fitness to parent, and Kari was concerned about Bryson's care of the children in a few noted instances. In our de novo review of the record, we can see that when considering the best interests of the children, Kari was always the more actively engaged parent both before and after her relocation to Holdrege. And although Bryson suggests he was the primary caretaker of the children for 19 months after January 2017, the record reflects a lesser period of time during which he was primarily responsible for parenting the children. In January and February 2017, although Kari was traveling back and forth between Lincoln and Holdrege, she was still spending about half her time in Lincoln. She also kept Kyler with her for week-long periods of time once or twice per month. By summer, the parents were equally sharing physical custody of the children on an alternating weekly basis. And although the children then primarily resided with Bryson for the 2017-18 school year, there was ample evidence that Kari remained very involved in managing the children's needs, including making medical appointments, arranging for Kyler's daycare, planning parties and other activities, and attending school and other events. She also continued to pay bills related to the Lincoln household. Kari's action to establish paternity and custody was filed in January 2018, and in March, the district court entered a temporary order awarding Bryson temporary custody, noting specifically that it was not in Kinley's best interests to transfer to the Holdrege School District in the middle of the spring semester of school. The temporary order granted Kari parenting time with the children for the entire months of June and July, with Bryson having alternating weekends; during this period, Kari was the primary caretaker of the children. Trial took place on August 1, at which time the district court made an immediate decision about physical custody, noting the impending start of school. Although Bryson's care of the children, particularly during the 2017-18 school year, is a significant factor to weigh in considering the children's best interests, it should not be the only factor, as he himself points out.

We note that although Bryson acknowledged needing his mother's assistance with the children after Kari relocated, we do not view this as a negative factor under the circumstances present in this case. Certainly, adjustments had to be made following the parties' separation, and both Kari and Bryson relied on family support and both were fortunate to have family members willing to provide such support.

In our view, the district court was faced with two acceptable options for physical custody, but was apparently more persuaded that Kari's parenting skills and active engagement with the children and her ability to meet their needs outweighed the option of leaving the children in Lincoln under Bryson's care. Additionally, there was persuasive evidence that Kari would facilitate communication between the children and Bryson in an agreeable manner, which would provide for the children's continued relationship with Bryson despite the distance between them. Based upon our review of the record, we cannot say the district court abused its discretion in awarding Kari physical custody of the children.

## 2. CHILD SUPPORT

Bryson's assigned error related to child support was dependent on a conclusion that the district court's physical custody determination was incorrect. Since we have already concluded the district court did not abuse its discretion in granting Kari physical custody of Kinley and Kyler, we do not find that the district court erred in ordering Bryson to pay child support. Because Bryson does not argue that the child support order was erroneous in any other way, we do not address this assigned error any further. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it. *State on behalf of Fernando L. v. Rogelio L.*, 299 Neb. 329, 907 N.W.2d 920 (2018).

## VI. CONCLUSION

For the reasons set forth above, we affirm the district court's August 7, 2018, order.

AFFIRMED.