IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE ON BEHALF OF JAXON D. V. TYLER B.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA ON BEHALF OF JAXON D., A MINOR CHILD,
AND TYLER B., APPELLEES,

V.

KAIYA D., APPELLANT.


Filed January 7, 2025.    No. A-24-264.


Appeal from the District Court for Gosper County: PATRICK M. HENG, Judge. Affirmed.

Mitchell C. Stehlik, of Stehlik Law Firm, P.C., L.L.O., for appellant.

Bronson J. Malcom, of Malcom, Nelsen & Windrum, L.L.C., for appellee.


RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

MOORE, Judge.

## INTRODUCTION

Kaiya D. appeals from an order of the district court for Gosper County denying her request to modify a custody order and parenting plan. On appeal, Kaiya claims the district court abused its discretion in determining that the case did not involve domestic intimate partner abuse and in not entering written findings accordingly, and in failing to award her primary legal and physical custody. For the reasons set forth herein, we affirm.

## STATEMENT OF FACTS

*Procedural History.*

A decree of paternity and support entered on July 27, 2017, established Tyler B. as the biological father of Jaxon D., born in 2017. The decree left the custody of Jaxon "unchanged with [Kaiya] as primary legal and physical custodian," subject to Tyler's reasonable parenting time.

- 1 -

On May 9, 2018, the district court entered a decree establishing custody and parenting time in response to Tyler's December 2017 complaint to modify. The court found that Tyler had established a material change in circumstances, including Kaiya's arrest in December 2017, the removal of Jaxon to California to the care of Kaiya's aunt, and the denial of parenting time afforded to Tyler. Based on the best interests of Jaxon, the court awarded Tyler legal and physical custody of Jaxon, subject to Kaiya's reasonable parenting time.

A stipulated order was entered on January 29, 2019, continuing Jaxon's legal and physical custody with Tyler, and modifying Kaiya's parenting time to occur on a graduated schedule based on Jaxon's age.

On April 22, 2021, the district court entered an order denying Kaiya's September 2020 counterclaim to modify. (Tyler had dismissed his complaint to modify.) In her request for modification, Kaiya asked that the court grant her legal and physical custody of Jaxon and grant Tyler reasonable and specific parenting time. In the alternative, she asked the court to grant the parties joint custody of Jaxon and grant Kaiya substantially increased parenting time. The court found that Kaiya had proven a material change in circumstances as it related to the deterioration of the parties' ability to communicate with one another, although it rejected her allegations that Tyler's moves from Gibbon to Axtell to Kearney and corresponding changes in residences amounted to a change in circumstances.

After consideration of Jaxon's best interests, the court found the legal and physical custody of Jaxon should remain with Tyler and Kaiya should continue to have parenting time as described in the January 29, 2019, stipulated order. In support of this conclusion, the court found that there were greater degrees of security and comfort in the relationship between Tyler and Jaxon, the environment offered by Tyler was the better of the two, Tyler's relationship with Jaxon was more extensive and complete, a change in routines and schedules would be disruptive to Jaxon, Tyler had more fully demonstrated his ability to provide physical care for Jaxon, and Jaxon had a stable and nurturing environment in Tyler's care.

On November 17, 2022, Kaiya filed a complaint to modify, requesting primary legal and physical custody of Jaxon subject to Tyler's supervised parenting time. The complaint alleged that since the entry of the district court's order in April 2021, there had been a substantial change in circumstances, specifically, Emily A. (Tyler's girlfriend) had filed a petition and affidavit to obtain an abuse protection order against Tyler; Tyler was rarely home and leaves Jaxon at home in Emily's care; Tyler was abusing alcohol; Tyler had assaulted others in Jaxon's presence; and Jaxon's continued placement with Tyler was no longer in the child's best interests.

On the same day, Kaiya filed a motion for ex parte orders, requesting temporary custody of Jaxon. Attached to the motion were an affidavit by Kaiya, screenshots of text messages exchanged between Emily and Kaiya regarding Tyler's alcohol use and parenting, and a copy of a petition and affidavit to obtain a domestic abuse protection order filed by Emily against Tyler in November 2022. Also filed the same day was an affidavit by Emily, alleging instances of domestic abuse by Tyler.

The following day the district court entered an ex parte custody order awarding Kaiya temporary custody of Jaxon. The order was silent as to Tyler's rights to parenting time. Although there is reference in the trial record to a temporary order and the parties' compliance therewith, the temporary order is not contained in our transcript.

*Evidence at Trial.*

A trial on the matter was held on February 12, 2024. The following evidence was adduced.

Emily testified that she had been in a relationship with Tyler from July 2019 until November 2022, and together they share two minor children. During her relationship with Tyler, Emily sometimes felt like Jaxon's primary parent. Because Tyler would have an hour-long commute home after work, by the time he arrived home at 7 p.m., Jaxon was in bed. Emily provided all of Jaxon's care when Tyler was working. However, when Tyler was home, he was present and involved in Jaxon's life. In the summer Tyler would swim with Jaxon in a pool set up in the backyard. Tyler would also take Jaxon out for bike rides and would cook dinner for the family after work.

Problems in the relationship began to occur in early 2022. Following the birth of their son, Emily suffered postpartum depression which exacerbated her preexisting severe depression. Additionally, Tyler's long work hours caused her to feel increasingly isolated. Emily moved out of the home she shared with Tyler in April or May 2022, but decided to move back in with Tyler shortly thereafter. She acknowledged that when she moved back in with Tyler, there were "some unresolved issues." In September, Emily and Tyler lost most of their possessions in a house fire. Emily described feeling "pretty overwhelmed by life" in the fall of 2022.

In November 2022, Tyler and Emily were involved in an altercation and Emily was charged with domestic assault. Tyler was the victim of the assault, and he was never criminally charged. Emily was taken to jail for 3 days and as a result, was separated from her young son. Emily was also newly pregnant with her and Tyler's second child at the time. Emily "was terrified I would be taken from my children, and so I immediately [sought] a protection order so my son was safe with me, that was my main goal."

Emily's November 2022 petition and affidavit to obtain a domestic abuse protection order and the subsequently granted ex parte domestic abuse protection order were received into evidence. At trial, Emily described incidents where Tyler made physical contact with her, but these incidents were often in the context of Tyler attempting to calm her down. When questioned on the allegations in her petition and affidavit, Emily did not outright deny her sworn statements, but also repeatedly stated that she wanted to ensure she maintained custody of her children. Emily's oldest daughter no longer lives with her "because of choices I made," and Emily "was terrified, and I needed to do whatever I could to make sure my son was safe with me." Emily agreed that this included misrepresenting some of her and Tyler's arguments and altercations to make it appear as though Tyler was more abusive than he was.

For example, in her affidavit attached to the petition for a protection order, Emily alleged that in July 2022, when she and Tyler were arguing in the kitchen, Tyler threw a bagel and a knife and later pushed Emily up against the door, preventing her from leaving the room. At trial, however, Emily testified that she and Tyler were arguing in the kitchen and Tyler "shut the door, so [their son] was in a different room." Tyler also threw a bagel which made Emily "kind of laugh about it." At one point Emily grabbed a knife but set it down. Later, Emily tried to open the door that Tyler had shut but found it locked. Tyler eventually opened the door so she could get their son.

The affidavit also alleged that in July 2022, Tyler grabbed Emily's neck and threw her into a door after the couple had a disagreement about Tyler spending time with another woman. Tyler had also cursed at Emily. Emily stated that "three children" were present at the time. At trial, Emily testified that in July 2022, she had been "freaking out" and "getting emotional." Though her allegation contained in the affidavit was true, she noted that Tyler had been attempting to calm her down. Emily testified that "I do get pretty emotional at times, and so I think it was more so that than anything. In the moment, it scared me." Emily's oldest daughter was visiting at the time but was "three rooms away" from Emily and Tyler during this incident.

The affidavit further alleged that in August 2022, Tyler and Emily got into a physical altercation where he repeatedly pushed Emily down, screamed at her, and spit in her face. Emily hit Tyler with an object in her hand and caused him to have a black eye. The affidavit alleged that a child was present during this incident. At trial, Emily testified that she had confronted Tyler about a subject he did not wish to discuss. Emily "kind of got in his face" and Tyler pushed her to "get out of his face" and Emily fell backwards onto a vacuum cleaner. Angered, Emily once again got into Tyler's face, and he pushed past Emily to continue getting ready for work. Emily recalled Tyler later taking her into the bathroom and "get[ting] on top of me and telling me to . . . stop."

Emily agreed that based on her trial testimony, she was the one who was frequently confronting Tyler and making it difficult for the two of them to get along in their shared home. Additionally, Emily had been concerned about Tyler's alcohol use as Tyler was regularly consuming alcohol during this period.

The incident on November 11, 2022, led to Emily's criminal charge and the couples' separation. Emily's account of this incident is reflected in her affidavit and petition, which alleged that Tyler began an argument with Emily while he was intoxicated, and Emily called the police for fear that Tyler would separate her from their son. According to Emily's affidavit, when the police arrived, "Tyler lied to the police, resulting in me being taken to jail[.]" Emily testified at trial that all the allegations she made in her petition and affidavit were accurate and did occur. However, in March 2023, she filed to dismiss the protection order and the ex parte domestic abuse protection order was dismissed in April.

Tyler testified consistently with Emily that their relationship began to the deteriorate under the stress caused by her postpartum depression and their house fire. Tyler denied any physical fights between Emily and himself from June to November 2022 but stated that at times he did have to put his hands on her to move her away from him. Tyler described Emily's emotional volatility and her habit of getting physically close to Tyler to instigate a fight.

Tyler denied assaulting anyone in the presence of Jaxon. However, he testified that "some of Jaxon's lashing out was because me and Emily were not getting along. Not necessarily screaming at each other in front of him, but . . . we would avoid each other . . . and I think it did affect Jaxon there." He also acknowledged that he was the subject of a 2018 protection order relating to a different woman, which remained in place following a contested hearing.

Based on the ex parte protection order and Emily's allegations regarding Tyler's alcohol use and lack of involvement as a parent, Emily was awarded temporary custody of their two children and Tyler was awarded supervised parenting time in March 2023. Emily described her custody case with Tyler as "in limbo."

At the time of trial, Emily and Tyler were getting along well and coparenting their two children. The children were primarily residing with Emily and typically spent time with Tyler every other weekend with occasional time during the week. Tyler's parenting time sometimes included Emily coming over to Tyler's house to do laundry. Emily had no concerns regarding the safety of her two children while in Tyler's care. There had been significant changes since November 2022, including that Tyler was no longer consuming alcohol and Emily had been taking medication and doing mindfulness work.

Emily described Kaiya as "next to impossible to communicate with" and believes that at times Kaiya seeks "vengeance." Emily received backlash any time she reached out to Kaiya with a concern. According to Emily, Kaiya does not believe that both parents need to coparent a child. Regarding the text messages she sent to Kaiya in November 2022 with concerns about Tyler's parenting, Emily sent them believing that she would be able to obtain custody of Jaxon, in addition to the two biological children she shares with Tyler. Emily agreed that she would have felt better about Jaxon staying in her care, rather than going to live with Kaiya.

Kaiya testified that she had filed the most recent complaint to modify after being contacted by Emily in November 2022. Kaiya was requesting primary custody of Jaxon and for Tyler's temporary parenting time schedule, every other weekend from Friday to Sunday and additional time as granted by Kaiya, to become permanent. Tyler testified that he had exercised all the parenting time awarded to him under the district court's temporary order.

Kaiya lives in Cozad, Nebraska, and Tyler lives in Kearney, Nebraska, a 45-minute drive, making split custody impracticable. Kaiya also believed her and Tyler's inability to communicate would make it difficult to share custody of Jaxon, though she noted that she and Tyler can coparent so long as he grants her "simple respect as a human being . . ." Tyler agreed that most communication between him and Kaiya leads to fighting.

Kaiya testified that Tyler did not exercise his parenting time with Jaxon until April 2023. Tyler testified that he contacted Kaiya about exercising his parenting time a few days after the November 2022 ex parte order had been entered. Tyler repeatedly called Kaiya's cell phone and his calls were sent directly to her voicemail, leading Tyler to believe that his phone number had been blocked by Kaiya. Kaiya denied ever having blocked Tyler but acknowledged that she "just chose not to talk to him."

Kaiya has married and lives in a three-bedroom, one-bathroom trailer with her husband, Jaxon, her two other biological children (ages 5 and 2), and a stepson from her husband's previous relationship (age 9) every other week. Jaxon shares a room with Kaiya's 2-year-old.

Text messages received into evidence reflect that in March 2023, Tyler asked Kaiya for parenting time with Jaxon. In the text message exchange, Kaiya told Tyler that her husband would be in touch about coordinating parenting time. At trial, Kaiya testified that she was likely working and wanted her husband to facilitate Jaxon's transportation.

Additionally, Tyler made Kaiya feel uncomfortable and she wanted her husband to "deal with it." Kaiya testified that over the years Tyler has called her a racial slur. Kaiya conceded that she did not allege that Tyler had called her the racial slur in any affidavit submitted to the court since November 2022. Tyler denied ever calling Kaiya a racial slur.

Kaiya began family counseling with Jaxon when she received temporary custody in November 2022 to help Jaxon adjust to living with her. Jaxon also attended weekly individual

counseling for 3 months following Tyler resuming his parenting time in the spring of 2023. At the time of trial, Jaxon was attending individual counseling monthly. Jaxon had also seen a psychiatrist once in July 2023 "because of the stuff Jaxon was saying."

Kaiya had observed that Jaxon's behavior had changed since resuming spending time with Tyler. After parenting time with Tyler, Jaxon "says a lot of dirty comments." A report from Jaxon's elementary school reflects that beginning in April 2023, "there has been a massive decline in Jaxon's compliant behavior." Jaxon's documented behavior included screaming in the classroom, punching his iPad, and refusing to complete his work. Jaxon also told a classmate "I'm going to hurt . . . with a knife."

Kaiya works overnight shifts at a manufacturing plant in Holdrege, Nebraska. Kaiya has a rotating work schedule where, in total, she works eight 12-hour shifts in a 2-week period. She also frequently picks up additional overtime shifts. Kaiya leaves Cozad by 5:10 p.m. to commute to Holdrege.

When Kaiya works overnight, her mother, who lives next door, cares for Jaxon and Kaiya's other children. Due to Kaiya's work schedule, Jaxon spends eight nights in a 2-week period sleeping over at his grandmother's home. When Kaiya gets off work in the morning, she will get Jaxon breakfast and take him to school. Jaxon sometimes goes to aftercare at his elementary school for 30 minutes or so, per his request.

Kaiya had recently been the victim of an assault by her husband in January 2024. Her husband came home intoxicated and began calling Kaiya demeaning names. The husband threw an item belonging to Kaiya into the hallway and the two began arguing. At some point the altercation became physical and Kaiya "slapped him in the face with a [metal] dog bowl." Kaiya testified that her husband grabbed her jaw and that as a result, her jaw was sore for a few days afterwards. Kaiya denied that her husband had ever put his hands around her neck or that she had said the same to law enforcement.

Kaiya then left her home to walk over to her mother's and her husband followed her outside and pushed her "out in the grass." Kaiya's mother was already outside and after seeing the husband push Kaiya, called the police. The husband later approached Kaiya's mother and pushed her up against a fence. The arguing between Kaiya and her husband continued before the husband returned home and Kaiya went to her mother's. Kaiya acknowledged that the police had to tase her husband to take him into custody.

Jaxon was not present for the altercation because Kaiya sent the children over for a sleepover at her mother's home before the argument with her husband began.

The husband was criminally charged and had recently moved out of the home at Kaiya's request and was staying in a motel. Kaiya later posted the husband's bond, explaining that she had done so because she did not want him to lose his job. She was not aware that a condition of her husband's bond was to have no contact with her until his first court date. The motel is a few blocks from Kaiya's home. Jaxon would sometimes spend time with the husband when the husband takes the children to the park or picks them up from school. The husband had recently enrolled in counseling and Kaiya testified that his behavior in January 2024 was "out of character," and that she intended to reconcile with him.

Kaiya reviewed the protection order documents filed by Emily and denied that Tyler had ever spoken to her or threatened her in the same way. Kaiya did not allege or adduce evidence of any physical abuse of her by Tyler.

Tyler lives in Kearney in a two-bedroom, one-bathroom rental home. Jaxon had lived in Tyler's home prior to the November 2022 ex parte custody order and Tyler maintains a bedroom for Jaxon. Tyler could not recall where he was living when the last custody order was entered as he had lived in both Axtell, Nebraska, and Kearney since 2019.

Tyler has worked as a mechanic for 5 years, working 8 a.m. to 6 p.m., Monday through Friday, and 8 a.m. to 5 p.m. every other Saturday. Tyler has been able to alternate his Saturdays at work with his parenting time weekends with Jaxon. Tyler has worked the same hours for a number of years. When Tyler was living in Axtell, he was commuting to Kearney for work and was out of the house from 7 a.m. to 7 p.m. During the period he lived in Axtell, he had a limited window of time at home when Jaxon was awake. Wanting more time with Jaxon was the primary reason for Tyler's move to Kearney.

If Tyler were to maintain primary custody, he planned to enroll Jaxon at an elementary school across the street from his home. He also had been paying a fee to hold a spot for Jaxon at a local daycare. Tyler would be available to take Jaxon to school in the morning and planned to delay his lunch break to pick Jaxon up from school and take him to daycare until 6 p.m., when Tyler was finished with work.

At the time of trial, Jaxon was 7 years old and in first grade. Jaxon receives some specialized supports in school and had an Individualized Education Program. Kaiya had a meeting less than a month prior to trial and chose to take Jaxon out of his program because he was meeting his goals at that time. Kaiya was not aware that Tyler had ever participated in school-related meetings though Kaiya did not notify Tyler about the Individualized Education Program meeting.

Tyler testified that Kaiya had only informed him of one of Jaxon's appointments, a meeting with a counselor. Tyler needed to take time off work to attend, and Kaiya told him that she would get back to him regarding the date of the appointment, but never did.

Tyler was responsible for Jaxon's medical and dental care from the entry of the stipulated order in January 2019 until November 2022. During that period, Jaxon was up to date on vaccines and physical exams.

Jaxon has friends in his Cozad school and had recently attended the birthday party of a classmate. In his free time, Jaxon likes playing with Kaiya's animals (including one dog, one cat, and six fish) and video games. Tyler enjoys showing Jaxon how to fix cars and bicycles in his garage as well as taking Jaxon to the park.

*Modification Order.*

In an order entered on March 13, 2024, the district court denied Kaiya's complaint to modify. The court made several credibility findings regarding the witnesses' trial testimony:

> The Court finds that [Emily's] testimony was very credible and was difficult for her. However, her testimony clearly established that her bottom line regarding the protection order incident in November 2022 was her fear that she was going to lose her children because of some prior actions. This was brought up by her on more than one occasion. While she did not deny her sworn statements in [her petition and affidavit], she

did put the entire incident in more perspective regarding her actions leading up to the incident. The Court clearly believes a physical incident did occur between her and Tyler, however the Court also believes her testimony at this hearing that she may have embellished the incident at that time in order to prevent her children being taken from her as a result of pending charges against her. This was the incident that led to the Ex Parte Order. She also testified that she currently successfully coparents with Tyler and that the issues he had with alcohol are no longer present. She has no safety concerns with him at this time.

The Court does not believe that either Tyler or Kaiya were entirely believable in their testimony. Tyler downplays incidents of violence in his past and his lack of involvement with Jaxon due to his work hours. It was clear that Emily [] was the primary "parent" during her time with Tyler. The Court believes Kaiya is also downplaying the recent incident with her husband and that the police somehow got it wrong. The fact that she wants her now estranged husband to be the contact between her and Tyler does not make sense. Further, her work schedule over every two-week period results in her only seeing Jaxon up to two hours on at least seven, if not more, days during that period.

The court further found that Kaiya and Tyler had reversed their situations since the ex parte custody order, given the domestic assault that had occurred in Tyler's household in November 2022 and the domestic assault in Kaiya's household in January 2024. The court also noted that a change in custody would not be in Jaxon's best interest given Tyler and Kaiya's living arrangements and long work hours.

The district court concluded that Kaiya did not meet her burden of proof in establishing by a preponderance of the evidence that a material change of circumstances has occurred since the stipulated order was entered in January 2019. Though Kaiya's complaint to modify began with the November 2022 altercation between Emily and Tyler, the evidence at trial demonstrated that little had changed between the parties. The court ordered that the terms of the stipulated order were again in full force and effect. The district court did not make special written findings pursuant to Neb. Rev. Stat. § 43-2932 (Reissue 2016).

Kaiya appeals.

## ASSIGNMENTS OF ERROR

Kaiya assigns, reordered, that the district court erred by (1) failing to make specific written findings in compliance with the Nebraska Parenting Act and (2) failing to grant her primary legal and physical custody of Jaxson.

## STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion. *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024). But when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

ANALYSIS

*Compliance With Nebraska Parenting Act.*

Kaiya argues on appeal that the district court's award of custody to Tyler failed to comply with § 43-2932. Before addressing Kaiya's arguments, we briefly summarize the relevant portions of the statute.

The statute has three basic parts, two being relevant to this appeal. The first, subsection (1)(a), identifies when the statute applies. The statute applies "[w]hen the court is required to develop a parenting plan" and a "preponderance of the evidence demonstrates" that "a parent who would otherwise be allocated custody, parenting time, visitation, or other access to the child under a parenting plan" has engaged in specified conduct including, relevant to this appeal, domestic intimate partner abuse. See § 43-2932(1)(a). "Domestic intimate partner abuse" means attempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument to a family or household member and a pattern or history of abuse. See *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019) (defining "domestic intimate partner abuse" for purposes of Nebraska Parenting Act).

The second part of the statute relevant to this appeal is subsection (3). If a parent is found to have engaged in any activity specified in subsection (1), subsection (3) prohibits the court from ordering legal or physical custody to be given to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose under such subsection. See § 43-2932(3).

Kaiya contends that she demonstrated that Tyler had committed domestic intimate partner abuse against Emily, his former girlfriend, and that the district court was therefore obligated by subsection (3) to make special written findings when it granted Tyler legal and physical custody of Jaxon. Kaiya agreed that she had never been subject to Tyler's behavior as described in Emily's petition and affidavit.

Section 43-2932(3) refers to protection of "the child and other parent" when a parent has engaged in domestic abuse. This court has concluded that § 43-2932 applies to instances where domestic abuse occurred between the parents of the child or children at issue, where it is necessary to ensure that there is no future domestic abuse to the "other parent." See *State on behalf of Dawn M. v. Jerrod M.*, 22 Neb. App. 835, 861 N.W.2d 755 (2015).

Kaiya seeks to distinguish the present case with *State on behalf of Dawn M. v. Jerrod M.* She contends that unlike the child at issue in *State on behalf of Dawn M. v. Jerrod M.*, Jaxon had shared a home with the alleged abusive parent and the third party victim. Kaiya also argues that there was evidence by Emily that Jaxon had witnessed instances of domestic intimate partner abuse.

Even if the statute applies in a situation as is present in this case, which issue we need not decide, the evidence does not establish that Jaxon witnessed any alleged abuse as argued by Kaiya. Though Emily's petition and affidavit describes two altercations with Tyler where children were present, she does not name Jaxon specifically. Additionally, none of Emily's trial testimony referenced Jaxon being present during any of her altercations with Tyler. Tyler testified to Jaxon being affected by the discord between him and Emily but denied that Jaxon had witnessed the two yelling at one another. Further, Emily and Tyler are no longer residing together.

The district court did not impose any limitations on Tyler's custody of Jaxon or make any special written findings that such limitations would protect Jaxon from harm. Neither did the district court explicitly find that § 43-2932 did not apply. However, we presume in a bench trial that the judge was familiar with and applied the proper rules of law unless it clearly appears otherwise. See *Randy S. v. Nicolette G.*, 302 Neb. 465, 924 N.W.2d 48 (2019). Here, the district court implicitly found that no domestic abuse occurred such that it was necessary to make any specific findings under the statute. Specifically, the court found that while a physical incident did occur between Emily and Tyler in November 2022, Emily may have "embellished" the incident at that time to prevent her children being taken from her because of pending charges against her.

Because there has been no domestic intimate partner abuse between the Tyler and Kaiya, and any alleged abuse between Tyler and Emily was not sufficient to trigger the provisions of § 43-2932, it was not necessary for the district court to make specific written findings pursuant to the statute before awarding Tyler custody. This assignment of error fails.

*Custody Request.*

Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). Modifying a custody or parenting time order requires two steps of proof. *Id*. First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id*. Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id*.

Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. *Id*. Proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances. *Id*. The rationale for limiting modifications of custody and parenting time to only those necessitated by a material change in circumstances is to avoid extensive and repetitive litigation and unnecessary, potentially harmful fluctuations in the child's life. See *id*. Simply put, a custody or parenting time order will not be modified absent proof of new facts and circumstances arising since the order was entered that affect the best interests of the child. See *id*.

Where the party seeking modification advances multiple reasons for modification, Nebraska appellate courts do not consider whether each individual factor standing alone constitutes a material change; we instead consider all the facts and circumstances raised by the evidence to determine whether there has been a material change. See *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021).

When reviewing all the facts and circumstances advanced by Kaiya in support of her request to modify legal and physical custody, we conclude that she failed to show a material change in circumstances.

Kaiya's complaint to modify alleged several changes in material circumstances, including that Emily had filed a petition and affidavit to obtain an abuse protection order against Tyler, Tyler

is rarely home and leaves Jaxon at home in Emily's care, Tyler is abusing alcohol, Tyler had assaulted others in Jaxon's presence, and that Jaxon's continued placement with Tyler is no long in the child's best interests.

As discussed above, the district court found that while the November 2022 domestic incident between Tyler and Emily did occur, Emily may have "embellished" the incident at that time to prevent her children being taken from her because of pending charges against her. Additionally, Emily filed to dismiss the ex parte protection order 4 months after it was entered against Tyler. At the time of trial, she and Tyler were getting along well, coparenting their children, and Emily had no safety concerns. Emily testified that since November 2022, Tyler had stopped his alcohol use and there was no evidence to the contrary. There was no evidence that Tyler had assaulted Emily, or anyone else, in Jaxon's presence.

Since the stipulated order was entered in January 2019, Tyler has moved from Axtell to Kearney to eliminate his commute to work. This move was motivated by Tyler's desire to spend more time with Jaxon. Tyler has maintained stable employment throughout this case and has maintained a residence in Kearney since the last custody order was entered in April 2021. Although Tyler and Emily ended their romantic relationship in November 2022, Tyler has plans in place for Jaxon's childcare and for Jaxon to attend a school across the street from Tyler's residence.

Upon our de novo review of the record in this case, we find no abuse of discretion in the district court's conclusion that the evidence adduced at the modification trial did not establish a material change in circumstances following the entry of the previous order that would warrant a change in custody. Since Kaiya failed to establish a material change in circumstances, we need not address the best interests prong in this modification action. See *Lindblad v. Lindblad, supra*. This assignment of error fails.

CONCLUSION

The record fails to establish by a preponderance of the evidence that written findings were required under § 43-2932. We also conclude that Kaiya failed to show a material change in circumstances occurred to necessitate a modification of child custody. Accordingly, we affirm.

AFFIRMED.